UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

X------------------------------------------------------X

THE RELATIONSHIP MARKETING
FACTORY, LLC, and IQUEUE RESPONSE
MANAGEMENT, LLC

                     Plaintiffs,

         v.

JEFFREY PERLMAN, and the ROEHM
PERLMAN FAMILY TRUST a/k/a the
ROEHM PERLMAN TRUST,

                     Defendants.

X------------------------------------------------------X

Case No.: 1:22-cv-07054

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

Plaintiffs, The Relationship Marketing Factory, LLC ("RMF") and iQueue Response Management, LLC ("IQRM") (collectively "Plaintiffs"), by its attorneys, Adelman Matz P.C., as and for its complaint against Jeffrey Perlman ("Perlman") and the Roehm Perlman Family Trust a/k/a the Roehm Perlman Trust (the "Trust") (collectively "Defendants"), alleges as follows:

## NATURE OF THE CASE

1.     The nature of this action is: (i) to recover damages against Defendants based on breach of contract; (ii) to recover overpayments made to Perlman by RMF; (iii) to recover damages against Defendants for breach of fiduciary duties; (iv) for the entry of a declaratory judgment against the Trust, or in the alternative, specific performance; (v) to recover damages against Perlman for breach of duty of loyalty to employer; and (vi) to recover damages against Perlman for conversion.

//

//

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and upon information and belief the matter in controversy exceeds $75,000, exclusive of interest and costs.

3.      Upon information and belief, venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(a) and (b) because a substantial part of the events and omissions giving rise to this claim occurred in this judicial district.

4.      Upon information and belief, the Court has personal jurisdiction over Perlman pursuant to NY CPLR § 302 because Perlman committed a tortious act within the state causing injury to person or property within the state, and the tortious act was not defamation of character.

5.      Upon information and belief, the Court has personal jurisdiction over the Trust pursuant to NY CPLR § 302 because the Trust engaged in the transaction of business within the state.

## NATURE OF THE PARTIES

6.      RMF is a limited liability company duly formed and existing under the laws of the State of New York with a principal place of business located at 47 Bay Road, Huntington Bay, NY 11743.

7.      IQRM is a limited liability company duly formed and existing under the laws of the State of New York with a principal place of business located at 47 Bay Road, Huntington Bay, NY 11743.

8.      Upon information and belief, Perlman is a natural person currently residing in the State of Florida with an address at 1715 NE 5th Court, Ft. Lauderdale, Florida 33301.

9.      Upon information and belief, the Trust is a legal entity with an address c/o Jeffrey Roehm Perlman, 1715 NE 5th Court, Ft. Lauderdale, Florida 33301.

## FACTUAL BACKGROUND

10.      On or about March 31, 2006, Perlman and his long-time business partner, Ellen Ryan ("Ms. Ryan") formed RMF for the purpose of providing marketing and sales services to organizations.

11.      Ms. Ryan and Perlman also formed another business together, IQRM, in May of 2018.

12.      At all relevant times since RMF and IQRM were formed, their principal place of business has been in New York, and all of the business operations for both companies have been run out of New York.

13.      The Articles of Organization of IQRM were filed on May 22, 2018 with  the Department of State of the State of New York to organize IQRM under and pursuant  to the New York Limited Liability Company Law.

14.      At all relevant times since IQRM's formation, Ms. Ryan has been the owner of 51% of IQRM, and Perlman has owned the other 49%.

15.      The Articles of Organization of RMF were filed on May 3, 2006 with  the Department of State of the State of New York to organize RMF under and pursuant  to the New York Limited Liability Company Law.

16.      The terms controlling the business operations of and ownership interest in RMF were laid out in an Operating Agreement executed by Defendants, with Perlman signing individually and as trustee on behalf of the Trust, and Ms. Ryan, on February 15, 2017, but effective as of May 3, 2006 (the "Operating Agreement").

17.     Pursuant to the Operating Agreement, Ms. Ryan is, and at all relevant times since the company's formation has been, the owner of 51% of RMF and the Managing Member and Chief Executive Officer ("CEO") of RMF.

18.     Pursuant to Section 8.5 of the Operating Agreement, Ms. Ryan, as the sole Managing Member of RMF, is responsible for directing and supervising the day-to-day business and affairs of RMF and approving all actions delegated to RMF's officers to be taken on behalf of the company.

19.     Pursuant to the Operating Agreement, the Trust was, from the date of the company's formation until December 31, 2021, the owner of 49% of RMF and a founding member of the company.

20.     At all times herein mentioned, the Trust, as a founding member of RMF, owed fiduciary duties to RMF.

21.     Pursuant to the Operating Agreement, Perlman was appointed as an Officer of RMF and held the title of President of RMF.

22.     Aside from his roles as an officer of RMF and as a member and co-owner of IQRM, Perlman was also a salaried employee as President of RMF.

23.     Perlman's compensation for his employment with RMF was processed through IQRM's payroll, and RMF funded Ms. Ryan's payroll.

24.     At all times herein mentioned, Perlman received disbursements from RMF, and his salary and health savings account ("HSA") reimbursements were paid through IQRM's payroll.

25.     For the year 2021, RMF, through IQRM, paid Perlman $10,000.08 for HSA Reimbursements ($416.67 per month) and his salary for the year totaled $45,525.82 ($1,905.30 per month).

26.     For the year 2021, RMF paid Perlman a monthly stipend of $2,325.40 per month, totaling $25,579.00 for the year, $2,477.41 for expense reimbursements, and $11,167.50 for List Building Payments.

27.     In total, in 2021, Plaintiffs paid Perlman $219,220.46.

28.     Pursuant to Section 8.5 of RMF's Operating Agreement, as an officer and president of the company, Perlman was responsible for the day-to-day management of the business and affairs of the company, which all took place in the State of New York. Further, the Operating Agreement states that, "[i]t is that [Ms. Ryan] and [Perlman] will devote their full business time and attention to the business of the Company and shall not, without the consent of the other, be engaged in any other professional activities, except for uncompensated involvement with charitable organizations."

29.     As an officer of the company, Perlman individually owed fiduciary duties to RMF as a matter of law.

30.     Upon information and belief, in 2021, Perlman engaged in a pattern of willful misconduct, nefarious, inappropriate, and grossly negligent behaviors in connection with RMF, which disrupted RMF's operations in New York.

31.     For example, Perlman instructed RMF's Compliance Officer and Director of Contact Center Operations, Naida Meagher ("Call Center Director") to halt compliance with the Federal Communications Commission's ("FCC") requirement to check for updates and comply with the Do Not Call registry.  The Call Center Director did not actually halt compliance with the

FCC requirement, as she knew that RMF is subject to the foregoing requirement for every outbound calling effort made from its call center, which reflects a significant portion of the marketing services RMF provides.

32.     Nonetheless, Perlman's direction raised a serious concern to Ms. Ryan, as he would have exposed RMF to legal liability and thwarted one of the main marketing services that RMF provides.

33.     Perlman also engaged in unnecessary projects and incurring unnecessary expenses for Perlman's personal benefits, including contracting with his husband, Scott Roehm-Perlman, to build an unnecessary database of insurance industry prospects using free data files from public libraries that were yielding significantly poor results.

34.     Perlman was expensing his husband's work on expense reports to RMF for the data analysis that his husband was doing (the "List Building Payments").

35.     Perlman was directed to stop this project on numerous occasions by Ms. Ryan and RMF's Call Center Director because it was negatively impacting the insurance business.

36.     Perlman ignored such requests and continued his efforts until Ms. Ryan instructed the Chief Financial Officer of RMF, Timothy Ryan (the "CFO") not to process any further payments to Perlman for the List Building Payments.  In addition, Perlman ultimately saved all of the prospects gathered to his own personal computer, against RMF data policy, for his own personal benefit.

37.     Perlman also manipulated the switchboard controlling all of RMF's incoming calls.  Specifically, RMF's toll-free number is listed on its website and is used for potential new business opportunities as well as calls directed to specific employees.  Without advising Ms. Ryan or anyone else at RMF, Perlman routed all of RMF's incoming calls, including those for

specific employees, directly to his office phone and did not forward the calls to the appropriate persons, throwing RMF's operations into disarray and causing RMF to miss potential new business opportunities..

38.     In addition, Perlman neglected the business responsibilities he had at RMF. Perlman failed to attend the required weekly meetings for the only client relationship Perlman was responsible for managing.  Perlman went as far as to not mention his dereliction of his client to Ms. Ryan or anyone else at RMF, ultimately leading the client to inquire with Ms. Ryan why Perlman was no longer engaged in their business.

39.     Perlman made himself effectively unavailable to RMF staff by ignoring calls, emails, Zoom meetings, and other communications during work hours.  There were also complaints of Perlman's conduct towards employees.

40.     Because of this ongoing pattern of behavior, on or around December 9, 2021, Ms. Ryan met with Perlman to inform him that due to his conduct and its negative impact on the business, it was time for Perlman to leave RMF.

41.     Although Perlman's termination was for cause, to the parties agreed to give Perlman the opportunity to "save face" by allowing Perlman to tell the staff he was resigning.

42.     Further, shortly after his termination, during a meeting with Ms. Ryan and the CFO on December 15, 2021 (the "December 15th Meeting"), Ms. Ryan communicated to Perlman that there were outstanding overpayments that RMF made to Perlman ("Overpayments") that needed to be repaid.

43.     Specifically, there was an overpayment of profits that Perlman had received from RMF for the fiscal period of May 2018 to April 2019, which totaled $72,957.93 or 30% of the Trust's 49% of the RMF profits, when he actually should not have received any distributions

because RMF's profits were mistakenly calculated.  The CFO explained the mistake to Perlman, and Perlman acknowledged that he was responsible for paying the Overpayments back to the company.

44.     In a letter dated December 20, 2021, Perlman made the planned announcement that beginning January 2022, he would resign as President of RMF ("Resignation Letter"). Perlman specifically stated in the Resignation Letter that, "This action should also allow us to enact ARTICLE VI, TRANSFER OF MEMBERSHIP INTERESTS as per the terms and conditions outlined in our partnership agreement so Managing Member, Ellen Ryan, can fully acquire ownership of Relationship Marketing Factory, L.L.C."

45.     In the Resignation Letter, Perlman was referring to the enactment of Section 6.7(b), which governs the Trust's obligation to sell its shares to Ms. Ryan upon its withdrawal from the company, which the parties agreed Ms. Ryan would be exercising and Perlman as trustee would be executing on behalf of the Trust.

46.     In pertinent part, Section 6.7(b) states:

"In the event of a Voluntary Withdrawal of a Member, the remaining Members shall  have the right (but not the obligation) to purchase their *pro rata* share (based on their  respective  Percentage  Interests)  of  the  Membership  Interests  of  such withdrawing  Member  (the  "Repurchase  Right"),  and,  **in  the  event  that  the remaining Members exercise the Repurchase Right, the withdrawing Member shall be obligated to sell to such Members all of the Membership  Interests of such  withdrawing  Member  and  such  interests  shall  constitute  "Purchased Interests"  hereunder.**  The Repurchase Right shall be exercisable by the remaining Members  upon  written  notice  to  the  withdrawing  Member  within  one  hundred eighty (180) days following the date on which the Voluntary Withdrawal occurs, and shall only be exercisable if all of the Membership Interests of the withdrawing Member are purchased . . .  in the event of a Voluntary Withdrawal pursuant to clause (c)[1] thereof, the purchase price shall, unless otherwise agreed, be equal to twenty five percent (25%) of the Withdrawing Member Fair Market Value of the Purchased  Interests  of  the  withdrawing  Member  as  of  the  Withdrawal  Date."

---

[1] A "Voluntary Withdrawal pursuant to clause (c)" refers to Section 1.1 of the Operating Agreement, and states "'Voluntary Withdrawal' means . . . (c) in the case of [Perlman], in the event of the termination of [Perlman] employment with the Company by the Managing Member with Cause".

(emphasis added).

47.     The Trust's withdrawal from RMF was pursuant to Section 6.7(b) of the Operating Agreement, as it was a voluntary withdrawal.

48.     Furthermore, as set forth above the voluntary withdraw was for cause due to Perlman's pattern of misconduct that he engaged in individually and on behalf of the Trust.

49.     As such, the Trust's shares were optioned to Ms. Ryan at a rate of "twenty-five percent (25%) of the Withdrawing Member Fair Market Value of the Purchased Interests of the withdrawing Member as of the Withdrawal Date".

50.     Further, Section 6.7(c) of the Operating Agreement requires that "[t]he closing of any sale of Purchased Interests pursuant to this Section 6.7 shall take place no later than […] thirty (30) days following the date the Repurchase [Right] is exercised."

51.     Ms. Ryan and Perlman had discussed and agreed that Ms. Ryan would be exercising her repurchase rights.

52.     Ms. Ryan also gave written notice to the Trust on numerous occasions, that she would be exercising her repurchase rights, including on or about February 10, 2022, which was acknowledged in writing by the Trust through Perlman.

53.     The parties began the process of repurchasing the RMF shares.

54.     However, because the parties could not reach an agreement on other open issues that they had been trying to resolve, the Trust, through Perlman, has refused to continue participation in the repurchasing process and Perlman has refused to allow the Trust's shares to be repurchased as required by the Operating Agreement.

55.     Indeed, as discussed below, upon information and belief, in violation of the Operating Agreement, Perlman is refusing to allow the Trust's shares to be repurchased and threatening to sell the Trust's shares to third parties.

56.     Following his termination, Perlman continued his campaign to destroy RMF's business, including causing RMF's email system and website to be down for days so that RMF was unable to carry out its business and communicate with its clients, which caused substantial harm to the business.

57.     Specifically, as part of Perlman's separation with RMF, on December 21, 2021, Perlman gave RMF the login credentials for RMF's GoDaddy Account ("GoDaddy Account" or "Account"), which RMF relies on to do business, as GoDaddy is used to purchase and host the RMF and IQRM universal resource locators ("URLs") that operate their respective websites and email servers.  Further, the GoDaddy Account is integral to conducting the day-to-day operations of RMF, as all of its website and e-mail services are supported exclusively through GoDaddy.

58.     Since the date of their purchase on June 4, 2006, RMF paid for the URLs associated with the GoDaddy Account.

59.     Upon his separation with RMF, Perlman intentionally did not provide RMF with the Account's PIN code ("PIN code"), which was crucial to gain access to the Account, nor did he re-associate the two-factor authentication (the "Two-Factor Authentication") with an RMF phone, and instead he left it with his personal phone number.  As a result, after Perlman's termination, RMF ultimately had no control over the GoDaddy Account and its URLs.

60.     On June 15, 2022, the URLs owned by the GoDaddy Account failed to auto-renew due to a lack of funds because the GoDaddy Account was still tied to Perlman's company

credit card, which had been cancelled, and RMF was unable to provide a new card because it did not have the PIN.

61.     On June 16, 2022, RMF's Director of Operations, Rich Martinez ("Mr. Martinez") found that RMF's website and email no longer worked.  Mr. Martinez discovered that this was due to the URLs no longer being associated with RMF's IP address because GoDaddy stopped publishing such association once the Account became delinquent.

62.     When Mr. Martinez contacted GoDaddy to bring the Account current, GoDaddy would not permit Mr. Martinez to make payment or make any changes to the payment sources on the Account without either the PIN code or the Two-Factor Authentication, which only Perlman had.

63.     Mr. Martinez attempted multiple times to reach Perlman in order to gain access to the GoDaddy Account, and left Perlman numerous voicemails and text messages–however Perlman never responded to Mr. Martinez.

64.     Other RMF staff members also attempted to reach Perlman to obtain the PIN, including RMF's Call Center Director.   In response to RMF's attempts to obtain the PIN, on June 21, 2022, Perlman sent a text message to RMF's Call Center Director asking her to call him in private.

65.     When the Call Center Director called Perlman, Perlman stated that he was involved in litigation with Ms. Ryan, which was not true at the time, that Ms. Ryan had fired him and he did not really resign, and that he wanted to sell the Call Center Director the Trust's shares in the company.

66.     Perlman threatened that if she did not take his offer, then the shares would be handed over to someone that RMF would not like.  The Call Center Director attempted to change

the subject by asking for the PIN code to access the GoDaddy Account, to which Perlman replied that he could not release that information, despite knowing of the ramifications it would have on RMF's business.

67.     Upon information and belief, in an effort to get a leg up in the negotiations over the terms of the repurchasing of his membership interests by Ms. Ryan, Perlman refused to grant RMF the PIN Code or Two-Factor Authentication required to access the GoDaddy Account and update the payment method.

68.     By Perlman holding the PIN hostage, he caused immediate and irreparable harm to the business because RMF was unable to conduct its normal business operations.

69.     Specifically, during that time employees were unable to send or receive emails from their regular email addresses that clients and potential clients knew.  Not only did this cause damage to RMF's reputation, but it also caused damage to RMF's relationship with its clients who were receiving "kickbacks" of undelivered emails to the company.  Because RMF relies on email as a method of communication, not having the capability to send or receive business emails was a major disruption for the entire team and for a time halted RMF's ability to conduct business as usual.

70.     By Perlman holding the PIN hostage, RMF's website was also down for two days—two days of clients and potential clients being confused about the status of the company and rendering RMF unable to receive new clients off of the website, as RMF typically does, resulting in lost revenue.

71.     On November 16, 2022, Perlman stole $187,842.00 from RMF's bank account by withdrawing the money from RMF's account without obtaining permission, consent or authorization to do so.

72.     RMF owns the funds in its bank account, which is crucial to keeping RMF in business.

73.     Upon information and belief, Perlman took the money out of RMF's account for his own personal use.

74.     Perlman knew that he did not have the unilateral authority to remove the money for personal use without the authorization of the controlling member, Ms. Ryan, because as a minority shareholder he has never been authorized to do so, as it is prohibited by Section 8.4(a) of the Operating Agreement, which states that the sale, lease, transfer, or other disposition by RMF of any material portion of its assets, other than in the ordinary course of business, requires the unanimous approval of the founding members, Ms. Ryan and the Trust.

75.     Upon information and belief, Perlman knew that he did not have the authority to remove RMF's money for personal use without the authorization of Ms. Ryan because he no longer works for RMF.

76.     Perlman's actions have harmed RMF because RMF is unable to access $187,842.00 of its funds for its business operations.

77.     As of the date of this Complaint, Perlman has not returned RMF's assets to RMF.

## COUNT I

## BREACH OF OPERATING AGREEMENT
## (RMF AGAINST DEFENDANTS)

78.     Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 77 above as though fully set forth herein.

79.     The Operating Agreement entered into between Ms. Ryan and Defendants is the agreement controlling the business affairs, management, and ownership interests of RMF.

80.     The Trust elected Perlman to enter into the Operating Agreement and to act on its behalf.

81.     Perlman entered into the Operating Agreement not only as trustee on behalf of the Trust but also solely as it relates to him personally.

82.     Section 8.5 of the Operating Agreement set out various terms regarding the obligations of RMF officers, including the obligations of Perlman as President.  Such terms included that:

   i.   "[O]fficers shall hold their positions until their resignation or earlier removal. It is expected that the Ryan and J. Roehm Perlman will devote their full business time and attention to the business of the Company[,]"

   ii.  Officers are responsible "for the day-to-day management of the business and affairs of the company[,]"

83.     RMF performed its obligations under the Operating Agreement, as Defendants were receiving payments from the company pursuant to the terms of the Operating Agreement.

84.     Defendants did not perform their obligations under the Operating Agreement in that Perlman stopped engaging in the day-to-day management of the business and affairs of RMF and he did not devote his full business time and attention to the business of RMF, which ultimately led to Perlman's voluntary withdrawal for cause.

85.     Upon Perlman's voluntary withdrawal for cause from RMF, the Trust was obligated to sell its Membership Interests to Ms. Ryan under Section 6.7(b) of the Operating Agreement if Ms. Ryan exercised her Repurchase Right.

86.     Under Section 6.7(c), the sale of the Trust's Membership Interests was to take place thirty days following the date the Repurchase Rights was exercised.

87.     Ms. Ryan exercised her right to purchase the Trust's Membership Interests.

88.     Perlman, as trustee of the Trust, has acknowledged on multiple occasions that Ms. Ryan exercised the Repurchase Rights, as well as the Trust's obligation to sell its Membership Interests to Ms. Ryan under the Operating Agreement and Perlman's obligation to execute the sale.

89.     Despite the Defendants' obligations under the Operating Agreement, Perlman has failed to diligently communicate with Ms. Ryan and has failed to close the sale within 30 days of Ms. Ryan exercising her Repurchase Rights.

90.     Defendants have delayed the sale of the Trust's Membership Interests in bad faith and in violation of the terms of the Operating Agreement.

91.     As of the date of this Complaint, Perlman has refused to enter into a good faith negotiation to sell the Trust's Membership Interests to Ms. Ryan, as is required under the Operating Agreement, and he has also threatened to sell the Membership Interests to other people in violation of the Operating Agreement.

92.     Defendants are therefore in breach of the Operating Agreement by failing to comply with the Section 6.7(c) requirement to close the sale of the membership internship to Ms. Ryan within thirty days of her exercising her repurchase rights.

93.     Further, Section 8.4(a) of the Operating Agreement states that the sale, lease, transfer, or other disposition by RMF of any material portion of its assets, other than in the ordinary course of business, requires the unanimous approval of the founding members, Ms. Ryan and the Trust.

94.     Defendants further breached the Operating Agreement by failing to comply with Section 8.4(a) when Perlman withdrew and transferred to himself a material portion of RMF's assets, $187,824.00, from RMF's bank account without obtaining the approval of Ms. Ryan.

95.     Upon information and belief, Perlman's withdrawal of RMF's assets was outside the ordinary course of business because Perlman took the money out of RMF's account for his own personal use.

96.     The Defendants' actions have harmed RMF because RMF is unable to access $187,842.00 of its funds for its business operations.

97.     As a result of the Defendants' conduct, RMF has sustained damages in an amount to be determined at trial, but not less than $351,536.56, plus interest costs, disbursements, and attorneys' fees.

## COUNT II

### RECOVERY OF OVERPAYMENTS
### (RMF AGAINST PERLMAN)

98.     Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 97 above as though fully set forth herein.

99.     As set forth above, Perlman received an overpayment of profits from RMF for the fiscal period of May 2018 to April 2019, which totaled $72,957.93 or 30% of the Trust's 49% of the RMF profits, which was a result of a mistake by RMF.

100.     During the December 15th Meeting, Perlman acknowledged that the Overpayments needed to be repaid.

101.     Despite Plaintiff's demand for Perlman to repay the $72,957.93 to RMF, Perlman has failed to repay any part thereof.

102.     As a result of Perlman's conduct, RMF has sustained damages in an amount to be determined at trial, but no less than $72,957.93, plus interest costs, disbursements, and attorneys' fees.

## COUNT III

## BREACH OF FIDUCIARY DUTY
## (PLAINTIFFS AGAINST DEFENDANTS)

103.     Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 102 above as though fully set forth herein.

104.     Perlman, as an officer of RMF and co-owner of IQRM, and as trustee of the Trust, owed fiduciary duties to RMF and IQRM.

105.     At all times herein mentioned, the Trust, as a founding member of RMF, owed fiduciary duties to RMF.

106.     Defendants breached their fiduciary duties by wrongfully delaying Ms. Ryan's ability to timely purchase the Trust's Membership Interests timely under the Operating Agreement.

107.     Perlman breached his fiduciary duties under the Operating Agreement by receiving his salary despite not performing any of his duties for the year of 2021, to the detriment of RMF and IQRM; wasting company funds on projects that Perlman was directed not to undertake for his own personal profit; submitting expense reports for data analysis that he himself was not performing for his own personal profit; costing RMF unknown opportunity by repeatedly disturbing RMF's business and call center operations and risking regulatory fees and ire stemming from Perlman's conduct; disturbing the operation of RMF in general by turning his agreed-upon withdrawal and retirement, stemming from his pattern of conduct adverse to the interests of RMF, into a management crisis through his refusal to enter into a good faith

negotiation to sell his Membership Interests, as the Operating Agreement requires; and by withdrawing $187,842.00 from RMF's bank account without having authorization from Ms. Ryan, thereby preventing RMF from using that money for its business operations.

108.    As a direct and proximate result of the Defendants' breach of fiduciary duties, Plaintiffs have suffered damages in an amount to be determined at trial, plus interest, costs, disbursements, and attorneys' fees.

109.    Defendants should also be required to pay punitive damages to punish them for breaching their fiduciary duties in an amount to be determined at trial but no less than one million dollars ($1,000,000.00), in order to deter them and others similarly situated from engaging in such conduct in the future.

## COUNT IV

## DECLARATORY JUDGMENT (OR, IN THE ALTERNATIVE, SPECIFIC PERFORMANCE)
## (RMF AGAINST THE TRUST)

110.    Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 109 above as though fully set forth herein.

111.    The Operating Agreement between Ms. Ryan and the Trust is a binding and enforceable contract.

112.    Under Section 6.7(b) of the Operating Agreement, the Trust is obligated to sell its Membership Interests in RMF to Ms. Ryan for 25% of the fair market value of the Trust's Membership Interests as of the withdrawal date, as Ms. Ryan is the sole remaining member of RMF and she exercised her repurchasing rights within 180 days following the date of the trustee's (Perlman's) voluntary withdrawal for cause.

113.    The repurchasing contemplated by the Operating Agreement was not consummated within 30 days as required by Section 6.7, and it has still not been consummated, and therefore the Trust in breach of its obligation under the Operating Agreement to sell Ms. Ryan its Membership Interests.

114.    The Trust's wrongful delay in closing the sale of his Membership Interests was in bad faith.

115.    The Trust's Membership Interests are unique and RMF cannot be adequately remedied by money damages when the Trust's 49% ownership in the company hangs in limbo.

116.    Perlman is indebted to RMF in the amount of $72,957.93 from being overpaid by RMF, a debt that is due and remains outstanding.

117.    The amount that Perlman would receive from the sale of the Trust's Membership Interests does not exceed the amount that Perlman owes the Company.

118.    Based on the foregoing, RMF is entitled to a declaratory judgment declaring that the Trust's Membership Interests in RMF be transferred to and are owned by Ms. Ryan pursuant to the terms of the Operating Agreement, and Perlman on behalf of the Trust would receive 25% of the fair market value of the Trust's Membership Interests as of the withdrawal date, as Perlman's voluntary withdrawal was for cause, if such number exceeds the amount that Perlman is indebted to RMF.

119.    In the alternative, RMF is entitled to specific performance of the Operating Agreement and its right to receive the Trust's Membership Interests by forcing the sale of the Membership Interests.

//

//

## COUNT V

## BREACH OF DUTY OF LOYALTY TO EMPLOYERS
## (RMF AND IQRM AGAINST PERLMAN)

120.     Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 119 above as though fully set forth herein.

121.     At all times herein mentioned, aside from his role as an officer of RMF and co-owner of IQRM, Perlman was also a salaried employee and therefore was bound to exercise the utmost good faith and loyalty in the performance of his duties for Plaintiffs.

122.     At all times herein mentioned, Perlman received disbursements from RMF, and his salary and health savings account ("HSA") reimbursements were paid through IQRM's payroll, which is funded by RMF.

123.     For the year 2021, RMF, through IQRM, paid Perlman $10,000.08 for HSA Reimbursements ($416.67 per month) and his salary for the year totaled $45,525.82 ($1,905.30 per month).

124.     For the year 2021, RMF paid Perlman a monthly stipend of $2,325.40 per month, totaling $25,579.00 for the year, $2,477.41 for expense reimbursements, and $11,167.50 for List Building Payments.

125.     In total, in 2021, Plaintiffs paid Perlman $219,220.46.

126.     Throughout 2021, while being compensated for his work as an employee of the Plaintiffs, Perlman engaged in a pattern of misconduct in bad faith and against the interests of Plaintiffs, including, but not limited to: receiving his salary despite not performing any of his duties for the year of 2021, to the detriment of RMF and IQRM; wasting company funds on projects that Perlman was directed not to undertake; submitting expense reports for data analysis that he himself was not performing; costing RMF unknown opportunity by repeatedly disturbing

RMF's business and call center operations and risking regulatory fees and ire stemming from Perlman's conduct; disturbing the operation of RMF in general by turning his agreed-upon withdrawal and retirement, stemming from his pattern of conduct adverse to the interests of RMF, into a management crisis through his refusal to enter into a good faith negotiation to sell his Membership Interests, as the Operating Agreement requires.

127.     Due to Perlman's ongoing pattern of misconduct throughout 2021, on or around December 9, 2021, Perlman was terminated for cause.

128.     Perlman's misconduct rises to the level of a breach of a duty of loyalty to Plaintiffs because Perlman's actions were taken in bad faith and were directly adverse to the interest of the Plaintiffs, his employers.

129.     Based on the foregoing, Plaintiffs are entitled to recover all compensation paid to Perlman during the period of his disloyalty, in addition to lost profits caused by Perlman as a result of his disloyal acts.

### COUNT VI

### CONVERSION
### (RMF AGAINST PERLMAN)

130.     Plaintiffs repeat and re-allege each of the allegations set forth in paragraphs 1 through 129 above as though fully set forth herein.

131.     On November 16, 2022, Perlman stole $187,842.00 from RMF's bank account by withdrawing the money from RMF's account without obtaining permission, consent or authorization to do so.

132.     RMF owns the funds in its bank account, which is crucial to keeping RMF in business.

133.     Upon information and belief, Perlman took the money out of RMF's account for his own personal use.

134.     Upon information and belief, Perlman knew that he did not have the authority to remove the money for personal use without the authorization of the controlling member, Ms. Ryan, because as a minority shareholder he has never been authorized to do so, and also because he no longer works for RMF.

135.     Perlman's dominion over RMF's property is in derogation of RMF's rights.

136.     As a direct and proximate result of Perlman's conversion of RMF's property, RMF has suffered damages in an amount to be determined at trial but no less than $187,842.00, plus interest, costs, disbursements, and attorneys' fees.

137.     Perlman should also be required to pay punitive damages to punish him for intentionally exercising complete dominion and control over RMF's property and converting it for his own use in an amount to be determined at trial but no less than one million dollars ($1,000,000.00), in order to deter him and others similarly situated from engaging in such conduct in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

a) An award based on Defendants' breach of contract in an amount to be determined at trial, but no less than $351,536.56, plus interest, costs, and attorneys' fees;

b) An award based on Perlman's failure to return the Overpayments made to him in an amount to be determined at trial, but no less than $72,957.93, plus interest costs, disbursements, and attorneys' fees;

c) An award based on Defendants' breach of fiduciary duties in an amount to be determined at trial, plus interest, costs, punitive damages, and attorneys' fees;

d)   A declaratory judgment declaring that the Trust's Membership Interests are transferred to and now owned by Ms. Ryan, and the Trust would receive 25% of the fair market value of the Trust's Membership Interests as of the withdrawal date, as Perlman's voluntary withdrawal was for cause, but only if such number exceeds the amount that Perlman is indebted to RMF; or alternatively, specific performance of the Operating Agreement and its right to receive the Trust's Membership Interests by forcing the sale of the Membership Interests;

e)   An award to recover all compensation paid to Perlman during the period of his disloyalty, in addition to lost profits caused by Perlman as a result of his disloyal acts;

f)   An award based on Perlman's conversion of RMF's funds in an amount to be determined at trial but no less than $187,842.00, plus interest, costs, punitive damages, and attorneys' fees;

g)   For the Plaintiffs' reasonable attorneys' fees and costs in this action; and

h)   For such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all claims for relief and issues triable by jury.

Dated: New York, New York  
     November 18, 2022

Respectfully submitted,

ADELMAN MATZ P.C.

By: _____

Sarah M. Matz, Esq.  
Gary Adelman, Esq.  
*Attorneys for Plaintiffs*  
1173A Second Ave, Suite 153  
New York, New York 10065  
Telephone: (646) 650-2207  
E-mail: sarah@adelmanmatz.com  
E-mail: g@adelmanmatz.com